UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| S.A.,<br><br>    Plaintiff,<br><br>    v.<br><br>KILOLO KIJAKAZI,<br><br>    Defendant. | Case No. 22-cv-02938-LB<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF Nos. 19, 22 |

**INTRODUCTION**

The plaintiff S.A., a minor under the age of eighteen, seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying his claim for supplemental security income benefits under Title XVI of the Social Security Act.[1] The plaintiff moved for summary judgment, the Commissioner opposed the motion and filed a cross-motion for summary judgment, and the plaintiff filed a reply.[2] Under Civil Local Rule 16-5, the matter is submitted for decision without oral argument. The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings.

---

[1] Mot. – ECF No. 19. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.*; Cross-Mot. – ECF No. 22; Reply – ECF No. 23.

ORDER – No. 22-cv-02938-LB

**STATEMENT**

**1. Procedural History**

The plaintiff applied for Title XVI supplemental-security income on January 19, 2018.[3] The Commissioner denied his claim on March 13, 2018, and again on reconsideration on June 4, 2018.[4]

The plaintiff asked for a hearing before an Administrative Law Judge (ALJ), and on August 21, 2019, ALJ Evangelina P. Hernandez held a hearing and heard testimony from a medical expert and the plaintiff's mother.[5] The ALJ issued an unfavorable decision on December 3, 2019.[6] On June 25, 2020, the Appeals Council denied the plaintiff's request for review.[7] On August 11, 2020, the plaintiff filed a civil action appealing the Commissioner's denial.[8] The Commissioner agreed to voluntarily remand the case for further proceedings April 22, 2021.[9]

On December 23, 2020, in between the filing of the civil action and the voluntary remand, the plaintiff filed a subsequent Title XVI application. The state agency found him disabled as of December 23, 2020.[10] On August 9, 2021, the Appeals Council vacated the ALJ's prior unfavorable decision, affirmed the subsequent state agency approval, and remanded the case to the ALJ to consider the period from January 19, 2018, to December 23, 2020 (the time between the plaintiff's first application and the state agency allowance).[11]

On remand, the ALJ held a hearing on December 15, 2021.[12] On February 2, 2022, the ALJ found that the plaintiff was not disabled during the relevant period.[13] On May 18, 2022, the

---

[3] AR 187–96. Administrative Record (AR) citations refer to the page numbers in the bottom-right hand corner of the AR.

[4] AR 102; AR 110.

[5] AR 59–80.

[6] AR 15–28.

[7] AR 1–3.

[8] AR 542–44; Case No. 3:20-cv-05569 (N.D. Cal.).

[9] AR 549–51.

[10] AR 463.

[11] AR 463; AR 552–55; Mot. – ECF No. 19 at 5–6.

[12] AR 490–505.

[13] AR 463–81, 488–505; Mot. – ECF No. 19 at 7.

plaintiff commenced this action for judicial review regarding his disability status during the closed period (January 19, 2018, to December 23, 2020). The parties each moved for summary judgment.[14] All parties consented to magistrate-judge jurisdiction.[15]

### 2. Medical Records

The plaintiff was born on August 5, 2015.[16] He began having seizures in September 2016.[17] He has been diagnosed with a seizure disorder and asthma and receives care at UCSF Benioff Children's Hospital in Oakland and Kiwi Pediatrics in Berkeley, California.[18] He is treated for partial epilepsy, left frontal heterotopia, and asthma.[19]

In January 2017, the plaintiff's doctors prescribed Levetiracetam (Keppra) for his seizures and albuterol for asthma.[20] He remained seizure-free until August 2017. His parents reported in June 2017 that he had no side effects and was doing well, although he was "more irritable than most" two years olds.[21] Following a seizure in August 2017, his doctors increased his Keppra dosage to 300 mg. After another seizure in September 2017, they increased Keppra to 500 mg.[22] An electroencephalography (EEG) that month returned normal results.[23]

Hospital notes from January 2018 indicate that the plaintiff started crying in his sleep after starting Keppra.[24] At a neurology follow up in April 2018, the plaintiff's mother indicated he had

---

[14] Compl. – ECF No. 1; Mot. – ECF No. 19; Cross-Mot. – ECF No. 22.
[15] Consents – ECF Nos. 2, 8.
[16] AR 82.
[17] AR 291–97.
[18] AR 33, 287, 325.
[19] AR 306, 325.
[20] AR 303, 452.
[21] AR 340.
[22] AR 308, 335.
[23] AR 307.
[24] AR 325.

been seizure-free since starting CBD four months prior.[25] In September 2018, his mother reported that his last seizure had been ten months prior.[26] One doctor noted that he was "very active."[27]

On October 23, 2018, Dr. Rachel Kuperman, the director of the pediatric epilepsy program at Kiwi Pediatrics, noted that his mother reported that while the plaintiff sleeps, "his eyes are rolling into the back of his head like he is going into a seizure," but then does not have one. Dr. Kuperman noted the plaintiff was "hyper" and that he had "a lot of nightmares." She further noted an October 2016 EEG suggested "a tendency towards partial seizures" and recommended further clinical correlation and an EEG at his next appointment. She diagnosed the plaintiff with partial epilepsy and left frontal heterotopia and prescribed 800 mg of Keppra twice daily. She noted that he was not receiving any speech therapy and included as part of the plan to "talk to pre-school about speech."[28]

In two emergency department visits in November 2018, one for abdominal pain and the other following a car accident, the attendees noted the plaintiff's history of seizures but did not indicate seizure activity.[29] In March 2019, the plaintiff visited his pediatrician at Kiwi Pediatrics complaining about his asthma. His mother indicated he had been using albuterol for his asthma and that he was missing school "due to URIs and associated asthma."[30] In April 2019, the plaintiff underwent a second EEG that returned normal results.[31]

On July 19, 2019, at a follow up appointment with Dr. Alice Rutatangwa, Pediatric Epilepsy Program Director at Benioff Children's Hospital, the plaintiff's mother reported that he had not had seizures for 1.5 years. Dr. Rutatangwa noted he was still taking CBD and was "calmer" but "still not receiving any speech therapy." She prescribed continuing a regiment of 800 mg of Keppra twice daily.[32]

---

[25] AR 380.
[26] AR 390.
[27] AR 456.
[28] AR 393–95.
[29] AR 396–412.
[30] AR 452.
[31] AR 413.
[32] AR 700, 703.

ORDER – No. 22-cv-02938-LB                      4

In September 2019, the plaintiff had another seizure. His doctors increased his Keppra dosage from 800 mg to 900 mg. He had two more seizures on November 30, 2019, and was admitted to the emergency department. These were "provoked seizures," likely as a result of a fever. He "screamed for 30–45 minutes and did not recognize his parents." His 102–103 degree fever persisted for two days afterwards. He slept more than usual, including an entire day at the hospital. His doctors prescribed Ativan as a bridge medication. After a brief discharge, he was brought back to the hospital on December 1 due to another seizure, "nonstop" vomiting for four days, and fever.[33]

Dr. Rutatangwa saw the plaintiff on December 12, 2019. She increased his Keppra dosage to 900 mg twice daily, prescribed Diazepam, and ordered routine EEGs given increased seizure frequency. She also reported side effects of hyperactivity and nightmares.[34]

There are no medical records after December 2019 for the relevant time period.

3. **Non-Medical Evidence**

On January 19, 2018, the plaintiff's mother submitted a Function Report for the plaintiff. She answered "no" to "[d]oes the child have difficulty understanding and learning?" She indicated the plaintiff's physical abilities were limited because he could not hold crayons or pencils with his thumb and fingers. She also reported the plaintiff had a limited ability to care for himself because he could not drink from a cup without help and could not feed himself with a spoon.[35]

Between September and November 2018, when the plaintiff was three years old, his mother and educators made an Individualized Learning Plan. His mother indicated that "[h]is language skills have improved," and that she "was concerned before." She marked "not yet" indicating the plaintiff could not string small items, hold a pen normally, or identify a drawing of a person. She also marked "no" indicating that she did not have any concerns about the plaintiff's behavior, he

---

[33] AR 703–14.

[34] AR 715–18.

[35] AR 205–12. The ALJ erroneously describes this report as being in September 2018. AR 473.

1  had no medical problems in the last several months, and nothing about him worried her. But she
2  also marked "yes" indicating she had concerns on "scored items," writing "tantrums" by hand.[36]
3    In October 2020, the plaintiff was referred to special education services for his transitional
4  kindergarten year.[37] At the end of the school year, in April 2021, the plaintiff's parents and
5  educators performed an individual education program assessment. The assessment summarized
6  how his "disability affects involvement and progress in the general curriculum" as follows:

> [The plaintiff] presents restlessness, loss of focus and concentration, and it requires frequent check-ins/redirection. Those symptoms impact his ability to perform effectively and consistently in an academic setting. Furthermore, the symptoms impede his alertness and ability to participate in the learning environment and access the curriculum. [The plaintiff] needs Speech support in Expressive/receptive language, Pragmatic Language, and Articulation to access the general education curriculum.[38]

12  The report summarizes functional and academic concerns, including that his teacher "is
13  concerned that he can't form letters or numbers. [The plaintiff] doesn't know where to write on the
14  paper . . . [and] doesn't know how to use basic school materials (scissors, glue, crayons) and lacks
15  motor skills, and his pencil grip is weak." The assessment also summarized the plaintiff's
16  communication development, including concerns that he was 67% intelligible and exhibited
17  "idiosyncratic speech sound errors." Additionally, the assessment noted his mother's concern that
18  he "gets upset quickly and reacts by throwing objects."[39]
19    That same month, the plaintiff's language pathologist, Isabel C. Fielder, M.A., prepared a
20  Speech and Language Report. The evaluation measured the plaintiff's "current communication
21  abilities" to determine appropriate education support programs. The background included the
22  plaintiff's medical conditions, and noted that he has "sleeping difficulties[] and experiences
23  seizures and epilepsy. [The plaintiff] is currently under the care of a physician and has been
24  prescribed Levetiracetam and Loratadine for his seizures and Keppra for epilepsy." The report

---

[36] AR 425–441.

[37] AR 729.q

[38] *Id.*

[39] AR 732.

included Ms. Fielder's observations, parental concerns, and a speech and language questionnaire from the plaintiff's transitional kindergarten teacher. For all questions, the plaintiff's teacher marked "never" or "rarely" or "emerging," but never marked "developing" or "mastered." The report concluded that the plaintiff has both an articulation disorder and a language disorder, and that he needs specially designed instructions or services.[40]

On April 26, 2021, Shala Jones, a pathologist with the Special Education Department of Berkeley Unified School District, performed a psychoeducational report initial evaluation. The plaintiff's mother referred him for initial evaluation "in response to delayed progress in writing, speech, and attention." A summary of the plaintiff's background noted that the plaintiff had epilepsy. His seizures occurred "twice a year" and his most recent seizure was "Thanksgiving 2020." They lasted as long as six minutes and the plaintiff could be disorganized for "several hours" afterwards. He has "night tremors" and "grinds his teeth while sleeping." The report found the plaintiff presented "below average skills in academic achievement areas." He did not meet the eligibility criteria for specific learning disability, but did meet the criteria for "Education Code Category of Other Health Impairment as a student with exceptional needs."[41]

**4. Administrative Proceedings**

The administrative record includes two hearings and two decisions from the ALJ. A medical expert, Dr. Sreedevi Chandrasekhar, served as a neutral expert at both hearings. The present case concerns the second hearing and second ALJ decision only.

**4.1   Administrative Hearings**

At the second hearing (on December 15, 2021), Dr. Chandrasekhar and the plaintiff's mother testified again. Dr. Chandrasekhar opined that the plaintiff had marked limitations in three areas: (1) acquiring and using information, (2) attending and completing tasks, and (6) health and physical well-being because of the seizures and medications. She affirmed this conclusion after the

---

[40] AR 779–92.

[41] AR 799–817.

plaintiff's counsel reminded her that the time period in question was a closed period. She noted that all three marked limitations are "compounded by the attention problem" and by the plaintiff's missing school often due to his health issues.[42]

The plaintiff's mother overviewed the plaintiff's health history and stated that he was on "adult level dosage of Keppra." She also testified to his education challenges, including that he was pulled out of school often due to illness or for IEP evaluation. She noted that "[i]mmediately after he started the Keppra," he "couldn't sit still" and that his anger was "totally out of control."[43]

### 4.2 ALJ Findings

The ALJ determined at step one that the plaintiff had not engaged in substantial gainful activity since his application date (January 19, 2018). She determined at step two that he had two severe impairments: asthma and a seizure disorder. His left frontal heterotopia was not an independently severe impairment.[44]

At step three, the ALJ concluded that the plaintiff's impairments did not meet or equal any of the listed impairments, specifically the listings 111.02 (epilepsy), 103.03 (asthma), or 112.111 (neurodevelopmental disorder). The plaintiff's asthma did not require three hospitalizations within a twelve-month period as described in listing 103.03. The seizure history did not demonstrate the requisite number of seizures in a three-month time period. The record did not establish a neurodevelopmental disorder.[45]

The ALJ also concluded that the plaintiff's impairments or combination of impairments did not functionally equal the severity of the listings. In reaching that conclusion, the ALJ reviewed the whole case record, including medical evidence and information from other sources (teachers, family, etc.), and information regarding how the plaintiff functioned over time and in all settings. Three of the functional domains are at issue here.

---

[42] AR 490–97.
[43] AR 497–505.
[44] AR 466–67.
[45] AR 467.

First, in looking at "acquiring and using information," which concerns "how well a child is able to acquire or learn information, and how well a child uses the information she has learned," the ALJ concluded the plaintiff had less than a marked limitation.[46] She noted that IED records from April 2021 indicated that the plaintiff had an articulation and language disorder and was behind in return to school learning, but found that the weight of evidence during the time period did not support a marked limitation. The ALJ credited a September 2018 "Function Report" in which the plaintiff's mother indicated he "did not have difficulty understanding and learning" and a September 2018 "Ages and Stages Questionnaire" where his mother denied having concerns about his behavior. The ALJ also noted the October 2018 hospital records reflect that the plaintiff's mother reported hyperactivity due to Keppra, but that he was "calmer" since starting CBD. In November 2018, his mother said she was concerned about the plaintiff's language skills but said they had improved. The plaintiff's teacher indicated the plaintiff had made progress. The ALJ also gave examples of how medical records indicated progress and explained why difficulties learning over Zoom did not demonstrate difficulties learning in an in-person environment.[47]

Second, the ALJ found the plaintiff had a less than marked limitation in "attending and completing tasks," which concerns "how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities," including ability to avoid impulsive thinking, prioritize competing tasks, and manage time. The ALJ noted that the plaintiff's mother reported he was doing well with no side effects until October 2018, when she reported hyperactivity and nightmares. Nor did providers report distractibility or "behavioral abnormality warranting follow up or changes in treatment" during the relevant period. The plaintiff's teachers at Head Start did not express concerns for attentiveness, even though the plaintiff's mother did. The ALJ noted difficulties with Zoom learning and found them insufficient to establish a marked limitation given that there were not similar difficulties outside of the

---

[46] AR 471–72.

[47] AR 472–73.

distance learning environments. And the ALJ considered evidence of asthma and breakthrough seizures but found that they did not demonstrate a marked limitation.[48]

Third, the ALJ found the plaintiff did not have a marked limitation in health and physical well-being. That domain "considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's health and functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects." The ALJ noted that the plaintiff was free from seizures between December 2017 and September 2019. Two breakthrough seizures in September 2019 and provoked (febrile) seizures in November 2019 did not establish a marked limitation during the relevant time period. These also did not result in a treatment change.[49]

The ALJ also summarized the opinions given by Dr. Chandrasekar, Dr. Taylor, and Dr. Hetland (the latter two were the state-agency medical consultants). She found that Dr. Chandrasekar's opinion finding marked limitations in three functional domains "unpersuasive for the period under consideration" because it was "not fully supported by the totality of the evidence during the period at issue." The ALJ explained that her "findings and rationale for all domains are discussed in further detail in the remainder of this decision."[50]

The ALJ also found the opinions of Dr. Hetland and Dr. Taylor to be unpersuasive because they did not "consider a large portion of the record submitted after the June 2018 reconsideration and pertaining to most of the period at issue." The ALJ noted that Dr. Hetland's opinion that the plaintiff had a less than marked limitation in the health and well-being domain was consistent with evidence from the period and was therefore persuasive.[51]

---

[48] AR 474–76.

[49] AR 480–81.

[50] AR 470–71.

[51] AR 471.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (cleaned up); 42 U.S.C. § 405(g). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance." *Kitchen v. Kijakazi*, --- F.4th ----, 2023 WL 5965704, at *3 (9th Cir. 2023) (cleaned up). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## GOVERNING LAW

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1013 (9th Cir. 2003).

"In determining eligibility for [supplemental security income benefits] based on a childhood disability, the Commissioner follows a three-step evaluation process." *G. J. v. Comm'r of Soc. Sec.*, No. 18-CV-03255-WHO, 2019 WL 2059656, at *3 (N.D. Cal. May 9, 2019) (citing 20 C.F.R. § 416.924(a)). "At [s]tep [o]ne, the Commissioner considers whether the child has engaged in substantial gainful activity; if so, the child is not disabled and the claim must be denied." *Id.* (citing 20 C.F.R. § 416.924(b)). "If the child is not engaged in substantial gainful activity, [s]tep [t]wo

requires the Commissioner to consider whether he or she has a 'severe' impairment or combination of impairments; if not, a finding of not disabled is made and the claim must be denied." *Id.* (citing 20 C.F.R. § 416.924(c)). "If the child has a 'severe' impairment or combination of impairments, at [s]tep [t]hree the Commissioner determines whether the impairment meets, medically equals, or functionally equals an impairment in the Listing of Impairments . . . found at 20 C.F.R., Part 404, Subpart P, Appendix 1." *Id.* (citing 20 C.F.R. § 416.924(d)).

"An impairment 'functionally equals' a listed impairment if it results in marked limitations in at least two of six functional domains or an extreme limitation in at least one domain." *Id.* (citing 20 C.F.R. § 416.926a(a)). The six functional domains are (1) "acquiring and using information," (2) "attending and completing tasks," (3) "interacting with and relating to others," (4) "moving about and manipulating objects," (5) "caring for oneself," and (6) "health and physical well-being." *Id.* (citing 20 C.F.R. § 416.926a(b)(1)(i)–(vi)).

"A marked limitation 'interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities.'" *Id.* (quoting 20 C.F.R. § 416.926a(e)(2)). "An extreme limitation 'interferes very seriously' with those abilities." *Id.* (quoting 20 C.F.R. § 416.926a(e)(3)). "In assessing whether the claimant has 'marked' or 'extreme' limitations, the ALJ must consider the functional limitations from all medically determinable impairments, including any impairments that are not severe." *Id.* (citing 20 C.F.R. § 416.926a(a)). "The ALJ must also consider the interactive and cumulative effects of the claimant's impairment or multiple impairments in any affected domain." *Id.* (citing 20 C.F.R. § 416.926a(c)).

In reviewing the evidence, the ALJ must "make a reasonable effort to obtain a case evaluation, based on the record in its entirety, from a pediatrician or other appropriate specialist, rather than simply constructing his own case evaluation from the evidence in the record." *Howard ex rel. Wolff*, 341 F.3d at 1014.

## ANALYSIS

The plaintiff seeks reversal and remand of the Commissioner's decision on three grounds: (1) the ALJ improperly assessed the medical opinion of Dr. Chandrasekhar; (2) the ALJ's functional-domain findings were not based on substantial evidence; and (3) the ALJ did not properly develop

the record.[52] The court grants the plaintiff's motion on all three of these interrelated issues. The court thus denies the Commissioner's cross-motion.

**1. Whether the ALJ Properly Considered Medical Opinion Evidence**

The plaintiff first contends that the ALJ improperly considered Dr. Chandrasekhar's opinion because the ALJ substituted her own lay opinion for Dr. Chandrasekhar's opinion and did not explain the factors of supportability and consistency as to Dr. Chandrasekhar.[53]

The ALJ is responsible for "resolving conflicts in medical testimony, and for resolving ambiguities." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (cleaned up). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (cleaned up).

The Social Security Administration promulgated new regulations governing an ALJ's consideration of medical opinions, effective March 27, 2017. The new framework "eliminate[s] the physician hierarchy, deference to specific medical opinions, and assigning weight to a medical opinion." *V.W. v. Comm'r of Soc. Sec.*, No. 18-CV-07297-JCS, 2020 WL 1505716, at *14 (N.D. Cal. Mar. 30, 2020) (cleaned up); 20 C.F.R. § 416.920c(a). Likewise, the Ninth Circuit's previous "requirement that ALJs provide 'specific and legitimate reasons' for rejecting a treating or examining doctor's opinion" is "incompatible with the revised regulations." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022). But the ALJ must still articulate how he or she considered every medical opinion and how persuasive he or she finds each. *Id.*; *V.W.*, 2020 WL 1505716, at *14; 20 C.F.R. § 416.920c(b). Persuasiveness is now evaluated based on five factors: "1) supportability; 2) consistency; 3) relationship with the claimant; 4) specialization; and 5) 'other factors.'" *V.W.*,

---

[52] Mot. – ECF No. 19.

[53] *Id.* at 11–15.

2020 WL 1505716, at *13 (citing 20 C.F.R. § 416.920c(c)); *Woods*, 32 F.4th at 792 (factors include "the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's records").

Supportability and consistency are the two most important factors, and the ALJ is required to specifically address them. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Kitchen*, 2023 WL 5965704 at *5. Regarding supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1). Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 416.920c(c)(2).

Unlike with supportability and consistency, the ALJ is not normally required to explain how they considered the other factors. *V.W.*, 2020 WL 1505716, at *14; 20 C.F.R. § 416.920c(b)(2). But the ALJ is required to do so where "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same." 20 C.F.R. § 416.920c(b)(3).

First, the plaintiff contends that the ALJ improperly substituted her lay opinion for that of Dr. Chandrasekar.[54] The ALJ had before her the medical opinions of Dr. Chandrasekar and the two state-agency consultants (Dr. Taylor and Dr. Hetland). As for Dr. Chandrasekar, the hearing transcript is unclear on whether Dr. Chandrasekar stated an opinion as to the relevant time period

---

[54] *Id.* at 11–14.

(January 2018 to December 2020) or "currently" as of the date of the hearing (December 2021).[55] As for the other doctors, the ALJ found them unpersuasive after noting that "neither [of them] had the opportunity to consider a large portion of the record submitted after the June 2018 reconsideration and pertaining to most of the period at issue."[56] The ALJ proceeded to independently make functional-domain findings, including by conducting her own analysis of objective medical findings.[57] This was error. *See, e.g.*, *Padilla v. Astrue*, 541 F. Supp. 2d 1102, 1106 (C.D. Cal. 2008) ("[A]s a lay person, an ALJ is simply not qualified to interpret raw medical data in functional terms.") (cleaned up).

Second, the plaintiff argues that the ALJ did not properly explain the factors of supportability and consistency as to Dr. Chandrasekar's opinion.[58] Before analyzing the functional domains, the ALJ stated the following: "I find Dr. Chandrasekar's opinion regarding the functional domains unpersuasive for the period under consideration. . . . I find it is not fully supported by the totality of the evidence during the period at issue. . . . My findings and rationale for all domains are discussed in further detail in the remainder of this decision."[59] The, the ALJ did not discuss Dr. Chandrasekar's opinion further.

It is true that an ALJ need not necessarily explain supportability and consistency immediately after stating her conclusion about a given medical opinion. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole[.]"). Still, the ALJ's premise here shows that she analyzed only consistency (with the record as a whole) and not supportability (that is, the internal persuasiveness of Dr. Chandrasekar's opinion). Even as to consistency, the ALJ did not sufficiently "provide[] . . . specific reference to any inconsistencies

---

[55] AR 492–96 (in response to the ALJ, Dr. Chandrasekar used the language "currently," and then even though the plaintiff's attorney briefly referred to the relevant time period, the subsequent discussion does not show that Dr. Chandrasekar was opining about the relevant time period).

[56] AR 471.

[57] *See, e.g.*, AR 473 (opining that "[t]he claimant's medical records . . . indicate appropriate development" and using as evidence that he could "build[] [a] tower with 6-8 blocks").

[58] Mot. – ECF No. 19 at 14–15.

[59] AR 470–71.

between [Dr. Chandrasekar's] opinion and plaintiff's treatment records." *Beech v. Colvin*, No. SACV 13-00782-MAN, 2014 WL 2931177, at *8 (C.D. Cal. June 26, 2014). This was error.

### 2. Whether the ALJ's Functional-Domain Findings were Based on Substantial Evidence

The plaintiff next contends that the ALJ's functional findings were without substantial evidence in three domains: acquiring and using information, attending and completing tasks, and health and physical well-being. For all three domains, the plaintiff generally argues that the ALJ's findings were based on either cherry-picked evidence or misstatements of the record.[60]

"An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Escamilla v. Berryhill*, No. 17-CV-01621-BAS-JMA, 2018 WL 2981156, at *6 (S.D. Cal. June 14, 2018) (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). Of course, "[w]here the evidence is susceptible to more than one rational interpretation, and the ALJ has provided a rational interpretation," the district court must uphold the decision of the ALJ. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

This issue is related to the other two issues, especially that in the next section. Because the court has already decided that remand is appropriate to reconsider the medical opinions, the court remands on this ground too. On remand, the ALJ can reconsider the record as a whole, with medical opinions that are more clearly tailored to the relevant closed time period.

### 3. Whether the ALJ Properly Developed the Record

Although the plaintiff bears the ultimate burden of proving that he is disabled, "the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (cleaned up). For a minor claimant, the ALJ must "make a reasonable effort to obtain a case evaluation, based on the record in its entirety, from a pediatrician or other appropriate specialist, rather than simply constructing his

---

[60] Mot. – ECF No. 19 at 15–23; Reply – ECF No. 23 at 8–13.

own case evaluation from the evidence in the record." *Howard ex rel. Wolff*, 341 F.3d at 1014. Here, given the lack of clarity from the record that the ALJ obtained a proper case evaluation for the time period in question, the court remands on this ground too. *Robinson v. Astrue*, No. CIV S-08-2296 DAD, 2010 WL 3733993, at *4–5 (E.D. Cal. Sept. 21, 2010) (remanding on this ground where the medical opinions did not pertain to the relevant time period) (collecting cases).

**4.  Whether the Court Should Remand for Further Proceedings or Determination of Benefits**

The court has "discretion to remand a case either for additional evidence and findings or for an award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether to remand for further proceedings or simply to award benefits is within the discretion of [the] court."). "[I]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." *Garrison*, 759 F.3d at 1019 (cleaned up).

Here, remand is appropriate to "remedy defects in the original administrative proceeding." *Id.*

## CONCLUSION

The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 30, 2023

_____
LAUREL BEELER
United States Magistrate Judge